J-S74014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| HECTOR AYALA, | |
| Appellant | No. 3547 EDA 2013 |

Appeal from the PCRA Order Entered December 3, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013066-2008

BEFORE:  BENDER, P.J.E., DONOHUE, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED JANUARY 20, 2015**

Appellant, Hector Ayala, appeals from the post-conviction court's December 3, 2013 order denying his petition for relief filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  After careful review, we vacate the court's order and remand for further proceedings.

This Court set forth the facts of this case in our disposition of Appellant's direct appeal, as follows:

> Complainant, M.R., age sixteen (16), and her mother, Maria Alfaro, a co-defendant in this case, resided at 3234 N. 7th Street, Philadelphia, PA, where they had a close relationship with Appellant[,] [whom] M.R. referred to as Uncle Tato. M.R. testified that when she was nine (9) years old Appellant and [her mother] came to her and told her about a religion known as Santeria and that Appellant was a "Santero" in the religion, i.e.,

---

[*] Retired Senior Judge assigned to the Superior Court.

one who is believed to communicate with the spirits, to have spiritual gifts, who has visions, and the ability to foretell the future by reading cards, *etc*. Appellant explained to M.R. that she had the power to protect her and her family if she engaged in certain rituals and made offerings to her spirit guides. Appellant further explained that the ritual and offerings required M.R. to engage in oral sex with him. Appellant assured M.R. that she was under no pressure, but that if she did not comply, her family would be in poverty and that it would be very difficult for them to move forward.

At the time, M.R.'s mother was involved in a relationship with a married man, Rick, who M.R. related to as her stepfather. M.R. had been led to believe that Rick's wife was angry about the relationship and that she cast a spell on [M.R.'s] [mother] which resulted in multiple problems for [M.R.'s] "stepfather," [her mother], and M.R. Soon after M.R. was asked to perform the "ritual," her mother lost her job and her "stepfather" went to jail. Eventually, M.R. was persuaded that performing the rituals would lift the curse and make her life better, and she therefore consented to permit Appellant to perform the ritual.

M.R. described the ritual, which occurred in her mother's room, and in her [mother's] presence, in detail. [M.R.'s mother] held her daughter's hand, while the naked Appellant fondled the child's body and ultimately performed oral sex on her, [collecting] her vaginal secretions into a bottle as a spiritual offering. The oral sex between Appellant and M.R. went on for a week, ultimately with vaginal intercourse to "finish the job" and chase the curse away. M.R.'s mother was not present while Appellant had intercourse with M.R. and Appellant instructed M.R. not to tell her mother.

When M.R. was eleven (11) or twelve (12) years old, Appellant instructed M.R. to perform oral sex on him. M.R. stated that Appellant penetrated her mouth with his penis. Appellant assured M.R. that to perform this act was doing something extra for the spirits and made them happier and it would provide a greater benefit to her family.

M.R. testified that Appellant never threatened or harmed her in any way. She believed that by performing the "ritual" the spirits would protect her mother and Rick and get them out of the trouble they were in. She stated: "I felt I was doing something I was supposed to: that this is something I had to do to help the

people I cared about. And I felt that he [Appellant] was telling me the truth, that he wasn't hurting me." Soon after M.R. began permitting Appellant to perform oral and vaginal sex on her and she [began] performing oral sex on him, her mother found a new job and Rick was released from prison, affirming for M.R. that the "rituals" were successful and that she was doing the right thing. M.R. believed that if she did not comply with Appellant's request for sex[,] bad things would happen to her and her family.

When M.R. was 12 years old she confided in her girlfriends, Complainant C.R., Complainant C.S., and her girlfriend T.L., and she told them that she was performing Santeria rituals with Appellant which consisted of engaging in oral and vaginal sex with him. She had previously introduced her girlfriends to Appellant as her uncle who the young girls knew was a Santero in the Santeria religion.

* * *[2]

_____

[2] A review of the certified transcripts reveals Appellant read cards for C.R. and C.S. at M.R.'s house, and told them about their futures. Appellant explained the girls could perform the "ritual" with him to prevent bad things from happening and to ensure good things would come their way. C.R. corroborated M.R.'s description of the ritual and explained she engaged in oral and vaginal sex with Appellant approximately once a week from when she was thirteen years old until she was fifteen years old. C.S. also corroborated C.R.['s] and M.R.'s descriptions of the ritual. C.S. testified she engaged in oral sex with Appellant one time, and vaginal sex with Appellant one time, but then discontinued the ritual with Appellant because it felt wrong. Thereafter, Appellant told M.R. the spirits were going to be very angry at C.S. because she was not giving them offerings.

_____

M.R. testified that Appellant provided financial assistance to T.L. and her family and that he told T.L. that if she permitted him to perform the ritual of oral and vaginal sex life would be better for them. T.L., then age 12, agreed to perform the ritual, and in the

presence of M.R. and her girlfriends, … Appellant performed oral and vaginal sex on her.

* * *[3]

_____

[3] The girls developed a code with Appellant to discuss the ritual. "Five" meant Appellant would perform oral sex on them; "Seven" was vaginal sex; and "Eight" meant the girls would perform oral sex on him.

_____

Complainants believed that Appellant told them things that were going to happen in their lives and believed him when he insisted that if they did not want those things to happen to them they could perform the "ritual" and engage in oral and vaginal sex with him and that their lives would be prosperous and happy.

At age 15, M.R. began having second thoughts about the sexual rituals with Appellant and sought help from her boyfriend, [Emmanuel Rodriguez], whose mother, Katherine Burgos, was a Santeria. M.R. and [Rodriguez] learned from Burgos that sex was not a required component of any religion, including Santeria. Upon hearing this[,] M.R. cried to [Rodriguez] and told him about what had occurred with Appellant. Later that day, M.R. reported the incidents to [her mother] who immediately called Appellant and demanded that he come to her home so that they could talk. Appellant arrived with T.L. When confronted, Appellant denied M.R.'s allegations. M.R.'s mother then got into Appellant's car, driving off with him and T.L. When they returned nothing more was said about the incidents, and Appellant left with T.L.

M.R. testified that initially her mother expressed remorse and guilt that she had permitted this to happen. [M.R.'s mother] told M.R. that she would take care of the situation, however, her mother continued the close friendly relationship with Appellant. Eventually, because of her mother's inaction, M.R. reported the incidents to a school teacher[,] who then reported to the school counselor, and on May 16, 2008[,] the police [were] called.

*Commonwealth v. Ayala*, No. 986 EDA 2010, unpublished memorandum

at 2-5 (Pa. Super. filed December 28, 2011) (quoting Trial Court Opinion,

1/31/11, at 2-7) (internal citations and trial court footnote omitted; footnotes added by this Court on direct appeal)).

Based on these facts, Appellant was arrested and proceeded to a jury trial that commenced on June 22, 2009, and continued until July 9, 2009.  At the close thereof, the jury convicted Appellant of rape of a child, involuntary deviate sexual intercourse (IDSI) with a child, aggravated indecent assault of a child, criminal conspiracy to commit IDSI with a child, and three counts each of statutory sexual assault, IDSI, unlawful contact with a minor, and corruption of minors.  Appellant was ultimately sentenced on April 14, 2010, to an aggregate term of 22 to 44 years' incarceration, followed by 20 years' probation.  Appellant timely appealed, and after this Court affirmed his judgment of sentence, our Supreme Court denied his subsequent petition for allowance of appeal.  *Commonwealth v. Ayala*, 40 A.3d 204 (Pa. Super. 2011) (unpublished memorandum), *appeal denied*, 50 A.3d 124 (Pa. 2012).

On April 5, 2012, Appellant filed a timely, counseled PCRA petition asserting numerous claims, most of which alleged the ineffective assistance of his trial counsel.  The Commonwealth filed a motion to dismiss Appellant's petition on February 27, 2013, to which Appellant filed a response on March 22, 2013.  The Commonwealth filed a second motion to dismiss on May 22, 2013.  On October 10, 2013, the PCRA court issued a Pa.R.Crim.P. 907 notice of its intent to dismiss Appellant's petition without a hearing.  Appellant did not file a response, and on December 3, 2013, the court issued an order formally dismissing his PCRA petition.  Appellant filed a timely

notice of appeal, as well as a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Herein, Appellant presents the following issues for our review:

I. The PCRA court erred in dismissing without a hearing Appellant's claim that trial counsel rendered ineffective assistance in failing to move to sever the co-defendant's case and for failing to appreciate the overwhelming amount of prejudicial information that would be admitted (and was in fact admitted) at this joint trial which would have been excluded at a severed trial. In the alternative, trial counsel was ineffective for failing to object to the admission of this evidence at this joint trial[.]

II. The PCRA court erred in dismissing without a hearing Appellant's claim that trial counsel rendered ineffective assistance in failing to object to testimony (1) that several different authority figures concluded that complainant M.R.'s accusations against Appellant were true and disbelieved her recantations and (2) that the government's official determination was that the allegations were true, as this invaded the province of the jury to decide the ultimate issue in the case and improperly bolstered the veracity of the complainant[.]

III. The PCRA court erred in dismissing without a hearing Appellant's claim regarding the recantations of Commonwealth witness M.R. that trial counsel rendered ineffective assistance in failing to object to (A) the trial court's failure to instruct the jury that these prior inconsistent statements could be used as substantive evidence or as impeachment; (B) the trial court's failure to identify what statements were inconsistent; (C) the trial court's error in failing to even properly characterize these prior statements as "inconsistent"; and (D) the court's instruction allowing the jury to consider as substantive evidence of guilt the many prior consistent statements of all of the teenage complainants[.]

IV. The PCRA court erred in dismissing without a hearing Appellant's claim that trial counsel rendered ineffective assistance in failing to object to the trial court's erroneous instruction prohibiting the jury from considering the delay in reporting as one issue affecting the complainant's credibility[.]

V. The PCRA court erred in dismissing without a hearing Appellant's claim that trial counsel rendered ineffective assistance in failing to object to the trial court's erroneous and incomplete instruction on how the jury should consider Appellant's evidence of good character[.]

VI. The PCRA court erred in dismissing without a hearing Appellant's claim that trial counsel rendered ineffective assistance in failing to object to the trial prosecutor's wildly improper impeachment of defense witnesses … [T.L.] [and Tamara L., T.L.'s mother].

VII. The PCRA court erred in dismissing without a hearing Appellant's claim that trial counsel rendered ineffective assistance in failing to impeach Commonwealth witness Emmanuel Rodriguez with various aspects of his juvenile criminal record[.]

VIII. Regarding the events in which the trial court prevented Appellant from challenging the Commonwealth's case through the testimony of Homeland Security Agent Steven Galambos – that Appellant had spent so much time in his company as a government informant that it was unlikely he could have done what the Commonwealth alleged – the PCRA court erred in dismissing this claim on several distinct grounds[.]

Appellant's Brief at i-ii.[1]

_____

[1] While Appellant presents eight overarching issues, he actually proffers at least 16 different claims for our review.  Despite raising this multitude of issues and sub-issues, Appellant's counsel nevertheless complains that he was forced to abandon four additional issues because this Court issued a *per curiam* order denying his motion for leave to exceed the page limitations for a principal brief.  **See** Appellant's Brief at 43 n.11; **see also** Superior Court Order, 7/18/14.  While counsel does not ask this Court for any type of relief for his purportedly having to omit these additional claims, we nevertheless take this opportunity to remind counsel,

> of the observation by the Honorable Ruggero Aldisert, Senior Circuit Judge of the United States Court of Appeals for the Third Circuit, that this Court has previously cited in **Kenis v. Perini Corp.**, 452 Pa. Super. 634, 682 A.2d 845 (1996), as well as other cases:

*(Footnote Continued Next Page)*

Before addressing each of Appellant's issues in turn, we begin by noting that, "[t]his Court's standard of review from the grant or denial of post-conviction relief is limited to examining whether the lower court's determination is supported by the evidence of record and whether it is free of legal error." ***Commonwealth v. Morales***, 701 A.2d 516, 520 (Pa. 1997) (citing ***Commonwealth v. Travaglia***, 661 A.2d 352, 356 n.4 (Pa. 1995)). Where, as here, a petitioner claims that he received ineffective assistance of counsel, our Supreme Court has stated that:

*(Footnote Continued)* ──────────────

> When I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that it is an irrebuttable presumption, but it is a presumption that reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness.
>
> ***Id.*** at 847 n. 3 (citations omitted); ***see also Commonwealth v. Snyder***, 870 A.2d 336, 340 (Pa. Super. 2005) ("[T]he effectiveness of appellate advocacy may suffer when counsel raises numerous issues, to the point where a presumption arises that there is no merit to any of them.") (citations omitted).

***J.J. DeLuca Co., Inc. v. Toll Naval Associates***, 56 A.3d 402, 410 (Pa. Super. 2012). We also find it curious that while counsel complains about our declining him additional briefing space, he nevertheless includes – at the start of the Argument portion of his brief – an unnecessary section entitled, "Preliminary Statement on the Weakness of the Commonwealth's Case." This 3½-page statement constitutes 1,200 of the 14,000 words permitted in a principal brief, ***see*** Pa.R.A.P. 2135(a)(1), and belies counsel's assertion in his "Motion For Leave of Court to File Oversize Brief" that he "limited his legal discussions to the bare essentials." Appellant's Motion, 6/26/14, at 2 (unpaginated).

> [A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner. To obtain relief, a petitioner must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the petitioner. A petitioner establishes prejudice when he demonstrates "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." … [A] properly pled claim of ineffectiveness posits that: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell the petitioner from counsel's act or omission.

***Commonwealth v. Johnson***, 966 A.2d 523, 532-33 (Pa. 2009) (citations omitted).

### Trial Counsel's Failure to Move for Severance

Appellant first argues that his trial counsel was ineffective for not filing a pretrial motion to sever Appellant's trial from that of his co-defendant, Maria Alfaro (M.R.'s mother).[2] Appellant contends that counsel's failure to seek severance resulted in prejudicial testimony being admitted against him. He details that testimony in his brief, and explains why such evidence would not have been admissible had his trial been severed from Alfaro's. ***See*** Appellant's Brief at 13-17. Appellant maintains that trial counsel "should

---

[2] Trial counsel did move for severance during trial, following Alfaro's cross-examination of Police Officer Cheryl Monzo. ***See*** N.T. Trial, 6/29/09, at 160-163. The trial court denied that motion. ***Id.*** at 163.

- 9 -

have moved for severance and supported his motion with argument that all of this evidence was inadmissible as against [Appellant,] and prejudiced [Appellant] even though the evidence may have been admissible against [Alfaro]." *Id.* at 17. Appellant contends that because his counsel failed to move for severance, he was ultimately "convicted with evidence that was inadmissible under the rules of evidence." *Id.*

The PCRA court concluded that our Court "considered the issue of severance" on direct appeal and, as such, it was "previously litigated" under 42 Pa.C.S. § 9543(a)(3) (mandating that to be eligible for relief, petitioner must prove that "[t]he allegation of error has not been previously litigated or waived"). PCRA Court Opinion (PCO), 6/13/14, at 7.

The PCRA court is incorrect for several reasons. First, in Appellant's direct-appeal Rule 1925(b) statement, he asserted that the trial court erred by denying his mid-trial motion to sever. While the trial court addressed that claim in its January 31, 2011 opinion, *see* Trial Court Opinion, 1/31/11, at 7-8, Appellant ultimately abandoned the issue in his brief to this Court. Consequently, there is no mention of severance in this Court's decision affirming Appellant's judgment of sentence. *See Ayala*, No. 986 EDA 2010.

Moreover, even if this Court had addressed on direct appeal Appellant's challenge to the *trial court's denial of his mid-trial motion to sever*, that claim is clearly distinct from Appellant's present claim alleging that *trial counsel acted ineffectively by not filing a pretrial motion to sever.* Moreover,

- 10 -

> [a]s the Supreme Court of Pennsylvania has opined in **Commonwealth v. Collins**, 585 Pa. 45, 888 A.2d 564 (2005), post[-]conviction relief claims alleging that counsel had provided ineffective assistance **are generally to be considered distinct from the underlying claims that the trial court erred**, even though such underlying claims of error had been litigated on direct appeal. **Id.** at 58, 888 A.2d at 571–572.

**Commonwealth v. Kimbrough**, 938 A.2d 447, 451 (Pa. Super. 2007) (emphasis added).

In sum, it is clear that this Court has not ruled on the merits of Appellant's claim that trial counsel acted ineffectively by not filing a pretrial motion to sever his case from Alfaro's. Consequently, the PCRA court erred in deeming this issue previously litigated. **See** 42 Pa.C.S. § 9544(a)(2) (stating that an issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue").[3] Because the PCRA court did not consider the merits of this ineffectiveness claim, we are compelled to vacate the court's order denying Appellant's petition and remand for further consideration of this issue. **See Commonwealth v. Jones**, 932 A.2d 179, 183 (Pa. Super. 2007) (vacating the order denying the PCRA petition and remanding "for consideration of [the] [a]ppellant's post-conviction claims" where the PCRA

---

[3] It is also apparent that Appellant did not waive this trial counsel ineffectiveness claim by not raising it on direct appeal. **See Commonwealth v. Grant**, 813 A.2d 726, 738 (Pa. 2002) (holding that "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review").

court incorrectly deemed the appellant's issues previously litigated and did not consider the merits thereof).

**Trial Counsel's Failure to Object to Certain Testimony**

In Appellant's second issue, he contends that trial counsel acted ineffectively by not objecting to certain testimony by M.R. and three other Commonwealth witnesses. Appellant describes the at-issue testimony as follows:

> M.R. testified that Police Officer Monzo, an officer trained and experienced in sexual assault investigations, believed M.R. when she said that [A]ppellant raped her and disbelieved her when she said that he had not raped her. [N.T. 6/24/09, 185] Trial counsel did not object.
>
> Suzanne Strange, the guidance counselor at M.R.'s school, testified that she did not believe M.R. when [M.R.] said that … [A]ppellant had not raped her. [N.T. 6/26/09, 56] Trial counsel did not object.
>
> Police Officer Monzo testified that M.R. said that none of the individuals to whom she recanted – [Department of Human Services (DHS)] social worker Michelle Ludwig, Ms. Strange[,] the guidance counselor, M.R.'s friend [Emmanuel] Rodriguez or [Rodriguez's] mother[,] Katherine Burgos – believed her recantations. [N.T. 6/29/09, 58] Trial counsel did not object.
>
> DHS social worker Michelle Ludwig testified that after investigation her office determined that "the allegations [against [A]ppellant] were indicated, and they were found to be true." [N.T. 6/30/09, 79] Trial counsel did not object.

Appellant's Brief at 18-19.

After setting forth this testimony, Appellant then avers it was improperly admitted, stating:

> The ultimate issue the jury was asked to decide was whether M.R.'s allegations against [A]ppellant were true or, as

the defense argued, whether her recantations created a reasonable doubt sufficient to acquit. Her credibility was the central issue this jury considered. The testimony of these witnesses invaded this province of the jury by addressing and then answering that ultimate issue. This was clear error. ***See Commonwealth v. Davis***, 650 A.2d 452, 460-61 (Pa. Super. 1994) (comments on witness credibility are impermissible); ***Commonwealth v. Loner***, 609 A.2d 1376, 1377 (Pa. Super. 1992) (conviction vacated and new trial granted where children's services caseworker in child sexual assault case testified that she believed the victim; "testimony … which serves to bolster the veracity of the child sexual abuse victim impermissibly infringes upon the province of the jury").

***Id.*** at 19.

Appellant also maintains that because the testimony set forth above was so clearly improper, trial counsel could have had no reasonable basis for failing to object. ***Id.*** at 20. In regard to whether he suffered prejudice from counsel's purported error, Appellant states:

[I]t is a very big deal when a jury is permitted to learn that five different witnesses of the caliber presented here – including the assigned sex crimes officer, a respected school counselor with experience in these matters, a trained DHS social worker who has seen it all, and the mother of the girl's boyfriend who might otherwise be skeptical of such a claim and who was described as a sort of substitute guardian and authority figure to M.R. – all voiced their opinions after hearing her story that she had in fact been raped. This was not one isolated, off-the-cuff remark by one lay witness followed immediately by a definitive curative instruction. No curative instruction was requested or given, and the vouching for M.R.'s credibility by such authoritative figures was repeated often.

***Id.*** at 20-21.

In rejecting this claim, the PCRA court reasoned:

The Commonwealth presented the evidence [of testimony by] law enforcement, a social worker, and a physician, as well as other fact witnesses to testify to the events in which they

- 13 -

participated in the investigation of the instant case. The Commonwealth, moreover, presented the testimony of three other minor females whose testimony corroborated the testimony of MR. The testimony presented was relevant and admissible and was more than sufficient to sustain the jury's verdict of Appellant's guilt. The court instructed the jury that it is the jury's function to decide the facts and the jury is presumed to have followed the Court's instructions. Appellant fails to demonstrate prejudice, *i.e.*, that but for the alleged omission of trial counsel the outcome of the proceedings would have been different.

PCO at 7-8.

We ascertain no error in the PCRA court's conclusion that Appellant failed to demonstrate prejudice. As our Supreme Court recently reiterated:

Respecting prejudice, we employ the ***Strickland***[4] actual prejudice test, which requires a showing of a reasonable probability that the outcome of the proceeding would have been different but for counsel's constitutionally deficient performance. ***See, e.g., Strickland***, 466 U.S. at 694, 104 S.Ct. 2052; ***Commonwealth v. Sepulveda***, 618 Pa. 262, 55 A.3d 1108 (2012). "[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." ***Commonwealth v. Spotz***, ––– Pa. ––––, 84 A.3d 294, 312 (2014) (citations omitted); ***see also Hinton v. Alabama***, ––– U.S. ––––, 134 S.Ct. 1081, 1089, 188 L.Ed.2d 1 (2014) ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.") (quotation marks omitted); ***Strickland***, 466 U.S. at 695, 104 S.Ct. 2052 (explaining same concept in context of penalty relief). A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim. ***Commonwealth v. Sneed***, 587 Pa. 318, 899 A.2d 1067, 1076 (2006).

---

[4] ***Strickland v. Washington***, 466 U.S. 668 (1984).

- 14 -

***Commonwealth v. Daniels***, 2014 WL 5505024, at *6-7 (Pa. October 30, 2014).

Here, Appellant has not convinced us that but for counsel's failure to object to the above-cited testimony, it is reasonable to believe the jury's verdict would have been different. Appellant's argument would be much stronger if M.R. were the only victim who accused Appellant in this case. However, he completely disregards that M.R.'s claims of abuse were corroborated by two other young women, C.R. and C.S. All three teenagers provided consistent testimony regarding the manipulation techniques utilized by Appellant to convince them to engage in sexual acts with him; the sequence of events that would occur before, during, and after Appellant's performing these sexual 'rituals' on them; and the number codes assigned to each type of sexual act.[5] Appellant does not explain why the jury would have disregarded M.R.'s, C.S.'s, and C.R.'s testimony and reached a different verdict had Appellant's counsel objected to the ostensibly improper testimony regarding M.R.'s credibility. Accordingly, the PCRA court did not err in concluding that Appellant failed to prove he was prejudiced by counsel's failure to object to the at-issue testimony.

### Trial Counsel's Failure to Object to Certain Jury Instructions

---

[5] The Commonwealth provides a succinct summary of the consistencies between the three victims' allegations against Appellant. ***See*** Commonwealth's Brief at 20-22. The Commonwealth's summation of the victims' testimony at trial is supported by our review of the record.

In Appellant's next three issues (III, IV, and V), he contends that counsel was ineffective for failing to object to various portions of the trial court's jury instructions. The record as it currently stands supports Appellant's claims that the court provided legally incorrect jury instructions.[6] However, according to the PCRA court and the Commonwealth, the notes of testimony of the jury instructions "were incorrectly transcribed." **See** PCO at 9-11; Commonwealth's Brief at 36, 39, 41.

As proof of this fact, the PCRA court explains that it read the jury charge from the Pennsylvania Standard Criminal Jury Instructions (PSCJI), which the parties agreed was appropriate during the charging conference. **See** PCO at 9-11. Accordingly, the PCRA court concludes that any discrepancies between the PSCJI and the actual transcription of the instructions provided in this case are simply transcription errors made by the

_____

[6] **See** Appellant's Brief at 22 (citing N.T. Trial, 7/9/09, at 42 (court's instructing jury regarding M.R.'s prior *inconsistent* statements, but stating "[y]ou have heard evidence that was made of a statement on an earlier occasion that was *consistent with the presented testimony*" and directing jury that it could consider these prior consistent statements "as proof of the truth of anything that the witness said in the earlier statement") (emphasis added)); Appellant's Brief at 26-27 (citing N.T. Trial, 7/9/09, at 43 (court's instructing jury that the complainants' "delay in making a complaint should be considered *in no way as devaluing their testimony*") (emphasis added)); Appellant's Brief at 31 (citing N.T. Trial, 7/9/09, at 45 (court's instructing jury that Appellant proffered character testimony "as to [Appellant's] having a good *representation* for being a law abiding and peaceable individual" and that "[e]vidence of good character by itself raises a reasonable amount *of guilt* and require[s] a verdict of not guilty") (emphasis added)).

court reporter. Because the "the suggested standard jury instruction [were] in fact given[,]" the PCRA court concludes that trial counsel cannot "be deemed ineffective for failing to object to" those instructions. *Id.* at 10. The Commonwealth argues that we are bound by the PCRA court's factual finding that the at-issue portions of the jury instructions are simply transcription errors. *See* Commonwealth's Brief at 34. In support, the Commonwealth relies on *Commonwealth v. Abu-Jamal*, 720 A.2d 79 (1998), and *Commonwealth v. Jones*, 596 A.2d 885 (Pa. Super. 1991).

However, both of those cases direct that we are bound to accept the PCRA court's credibility determinations and factual findings where "*there is record support*" for those findings. *Abu-Jamal*, 720 A.2d at 93 ("Where … *there is record support* for a PCRA court's credibility determinations, we, as a reviewing court, are bound by those determinations") (emphasis added); *see also Jones*, 596 A.2d at 887 ("The findings of the PCRA court will not be disturbed *unless they have no support in the record*.") (emphasis added). Here, nothing in the record before us supports the PCRA court's conclusion that the jury instructions were incorrectly transcribed. Therefore, we disagree with the Commonwealth that those findings are binding on appeal.

Instead, we conclude that remand is appropriate for the PCRA court and the parties to address this issue under Pa.R.A.P. 1922 and 1926. Rule 1922 provides, in pertinent part:

> **(a) General rule.** Upon receipt of the order for transcript and any required deposit to secure the payment of transcript fees the official court reporter shall proceed to have his notes transcribed,

and not later than 14 days after receipt of such order and any required deposit shall lodge the transcript (with proof of service of notice of such lodgment on all parties to the matter) with the clerk of the trial court. Such notice by the court reporter shall state that if no objections are made to the text of the transcript within five days after such notice, the transcript will become a part of the record. If objections are made the difference shall be submitted to and settled by the trial court. The trial court or the appellate court may on application or upon its own motion shorten the time prescribed in this subdivision.

…

**(c) Certification and filing.** The trial judge shall examine any part of the transcript as to which an objection is made pursuant to Subdivision (a) of this rule **or which contains the charge to the jury in a criminal proceeding,** and may examine any other part of the transcript, **and after such examination and notice to the parties and opportunity for objection (unless previously given) shall correct such transcript.** If the trial judge examines any portion of the transcript, he shall certify thereon, by reference to the page and line numbers or the equivalent, which portions thereof he has read and corrected. If no objections are filed to the transcript as lodged, or after any differences have been settled or other corrections have been made by the court, the official court reporter shall certify the transcript, and cause it to be filed with the clerk of the lower court.

Pa.R.A.P. 1922(a), (c) (emphasis added). Additionally, Rule 1926(a) states:

(a) If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court **after notice to the parties and opportunity for objection**, and the record made to conform to the truth.

Pa.R.A.P. 1926(a) (emphasis added).

Here, while the PCRA court's opinion has notified the parties of the purported errors in the transcript, they have not been provided an opportunity to object to the court's recollection of the jury instructions

actually provided. Additionally, the PCRA court has not corrected those errors and transmitted a supplemental record to this Court. Consequently, we direct that a hearing on these ostensible transcription errors is necessary, after which the court can correct any clerical errors, create a supplemental record, and reassess whether that record supports Appellant's claim that trial counsel acted ineffectively by failing to object to the portions of the jury instructions challenged in his petition. *See Commonwealth v. McDonald*, 428 A.2d 174, 174-175 (Pa. Super. 1981) (affirming the PCRA court's proceeding under Rule 1926 to correct an omission in the record, pursuant to which the PCRA court held a hearing and accepted testimony from the court reporter, as well as evidence of a recording of the trial testimony); *see also Cook v. Smith*, 812 F.Supp. 561, 563 (E.D.Pa. 1993) (stating that Rules 1922 and 1926 "set forth the proper procedures that must be followed in order to correct alleged discrepancies in the record").

## Trial Counsel's Failure to Object to Cross-Examination of Defense Witnesses

In Appellant's sixth issue, he avers that trial counsel acted ineffectively by not objecting to the Commonwealth's "wildly improper impeachment of defense witnesses Tamara [L.] and [T.L.]" Appellant's Brief at 33. While Appellant claims to object to testimony elicited from both T.L. and Tamara L., he only cites and discusses testimony by Tamara L. *See* Appellant's Brief at 33-34. Appellant describes the purportedly improper testimony as follows:

On cross-examination of Tamara [L.], the trial prosecutor elicited evidence that [T.L.] had many "illegal school absences" (and that Tamara [L.] had to go to Truancy Court), talked back to teachers, "ran the hallways[,"] and had been suspended three times from school – once for fighting, once for "endangering and ignoring health and safety[,"] and once for "using vulgar and ineffective language[."]

Appellant's Brief at 33-34 (citations to the record omitted). Appellant maintains that this testimony was inadmissible because it was irrelevant and unduly prejudicial. He also argues that Tamara L.'s testimony revealed inadmissible 'prior bad acts' of T.L. Thus, he contends that his defense counsel was ineffective for not objecting to this testimony.

After careful review, we disagree. By way of background, T.L. testified for the defense, and stated on direct-examination that M.R. told her that Appellant "had raped [M.R.,]" and that M.R. "wanted [T.L.], [C.S.] and [C.R.] to go [along] with her story." N.T. Trial, 7/6/09, at 61. T.L. testified that she told M.R. that she "wasn't going to be involved[,]" after which she and M.R. "stopped talking." *Id.* at 62. At one point during the direct-examination of T.L, defense counsel asked T.L. about her being injured in a car accident.[7] *Id.* at 65. T.L. claimed the accident occurred in March of 2007, and that as a result, she did not attend school for approximately "two or three months…." *Id.* at 65-67.

---

[7] It appears that the relevancy of the date on which T.L.'s car accident occurred was to establish that in 2006, T.L. was living with her aunt, whose residence was next door to M.R.'s home. *See* N.T. Trial, 7/6/09, at 124-127; 152-153. T.L. moved in with her mother, Tamara L., shortly before her car accident. *Id.* at 122.

Tamara L. took the stand after T.L. Tamara also testified that she "was certain" T.L. was injured in a car accident in March of 2007. *Id.* at 120, 124. Tamara stated that prior to the accident, T.L. was living with Tamara's sister. *Id.* at 121. T.L. moved in with Tamara "[s]ometime in February of 2007." *Id.* On cross-examination, the Commonwealth questioned Tamara as follows:

[The Commonwealth]: When [T.L.] was staying at [her aunt's] house, how often did you see her?

[Tamara]: All the time.

…

[The Commonwealth]: How did [T.L.] get … to school?

[Tamara]: I would drive her or my sister would drive her.

[The Commonwealth]: Are you aware that [T.L.] missed a significant number of days of school in fall of 2006…?

[Tamara]: It was all due to her car accident.

[The Commonwealth]: This is before the car accident I'm talking about?

[Tamara]: Oh, I don't know how because the only absences that she had – I don't have any idea where that came from.

[The Commonwealth]: So I have a copy [of school records] in front of me.

…

Ma'am, you probably have not seen this before?

[Tamara]: I've seen [it].

[The Commonwealth]: You've seen it?

[Tamara]: Yeah, I went to school to straighten that out.

- 21 -

[The Commonwealth]: Look here, 2006 and 2007. Do you see how there is a whole bunch of dates listed there.

[Tamara]: Yes.

[The Commonwealth]: And then there are some codes after those dates?

[Tamara]: Yes.

[The Commonwealth]: Do you agree with me that in 2006 and 2007, it says that [T.L.] was illegally absent on September 21st, [September] 22nd, September 25th, September 27th, October 4th – do you agree with me so far?

[Tamara]: Yes.

[The Commonwealth]: And then she was late a couple of days after that. It looks like it was a lot [of] excused absences, meaning that she had permission…?

…

[Tamara]: Yes.

[The Commonwealth]: It also said that she's suspended for two days; correct?

[Tamara]: Yes.

[The Commonwealth]: It said that she got suspended three times for fights?

[Tamara]: No, not fighting.

[The Commonwealth]: Not fighting[.]

[Tamara]: Not fighting.

[The Commonwealth]: Why was she suspended?

[Tamara]: Mainly because of running in the hallways or may be [*sic*] talking back to the teacher. I know that I've had problems with her fighting in school.

[The Commonwealth]: If you look a little further down there and it says suspension and then it gives the reason.

[Tamara]: Okay.

[The Commonwealth]: One says endangering and ignores health and safety and the third one is prohibition of fighting, mutual confrontation of all physical contact?

[Tamara]: About the fighting, I never had no problems with her for no fighting. But yeah, her talking back and all that, yeah. I had one incident with one teacher.

[The Commonwealth]: So then continuing back to the dates [we are] looking at – we're not going through every single date. You'd agree with me that – I'm talking before March, before she had her accident that it was a significant number of incidents?

[Tamara]: Yes.

[The Commonwealth]: You see that it's January 2nd, illegal, January 3rd, illegal, January 4th, illegal, and then it's nothing marked again until March?

[Tamara]: I don't know.

[The Commonwealth]: And were you aware at the time in the fall of 2006, … that she had missed that many days?

[Tamara]: No, because I had been to the school like I said. I had to go to Truancy Court, in which they suspended that. They sent me a letter. I did not have to show up after I called because – well, the school never showed me this. This is the first time I've seen this.

*Id.* at 154-157.

After reviewing this portion of the Commonwealth's cross-examination, we disagree with Appellant that the cross-examination was improper. The Commonwealth's question about T.L.'s missing "a significant number of school" was asked to impeach Tamara's testimony that she saw T.L. "all the time" and drove her to school. *Id.* at 154. When Tamara then stated that T.L. missed school due to her accident, the Commonwealth permissibly impeached her with evidence that T.L. missed many days of school *before*

- 23 -

her accident occurred.  *Id.* at 155-156.  During that line of questioning, the Commonwealth mentioned that T.L. missed two days of school because she was suspended for fighting, which Tamara disputed.  *Id.* at 156.  The Commonwealth was then allowed to ask Tamara why T.L. was suspended, and to also point out to Tamara that the school's records indicated T.L. was suspended for fighting.  *Id.* at 156-157.

In sum, we ascertain no error in the PCRA court's determination that the Commonwealth's cross-examination of Tamara was permissible to impeach her testimony and, therefore, defense counsel did not err in failing to object.  *See* PCO at 14 (citing *Commonwealth v. Chmiel*, 889 A.2d 501, 527 (Pa. 2005) ("Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish a witness' motive for testifying.").  Moreover, we also note that Appellant makes no argument that but for counsel's failure to object to the above-quoted testimony, the outcome of his trial would have been different.  Accordingly, even if the Commonwealth's cross-examination was improper, Appellant has not demonstrated that he was prejudiced by counsel's omitted objections.

## Trial Counsel's Failure to Impeach Emmanuel Rodriguez

Appellant next argues that his attorney acted ineffectively by not impeaching M.R.'s boyfriend, Emmanuel Rodriguez, with evidence that he had non-final criminal dispositions pending at the time he provided a statement to police in May of 2008, and at the time he testified for the Commonwealth at Appellant's trial in June of 2009.  Appellant explains that

"Rodriguez testified for the Commonwealth that he was M.R.'s boyfriend, that she confided in him that [A]ppellant sexually abused her, that he corroborated her reasons for recanting, and that she had a sad demeanor as a result of her victimization." Appellant's Brief at 36. Appellant maintains because Rodriguez was an "important Commonwealth witness," trial counsel acted ineffectively by not impeaching him with his allegedly non-final criminal dispositions that were pending at the time he testified.

In rejecting this claim, the PCRA court concluded, *inter alia*, that Appellant did not demonstrate he was prejudiced by counsel's failure to impeach Rodriguez in this regard. The court stated: "Viewed in light of other overwhelming[,] credible[,] and sufficient evidence presented by the Commonwealth which supports the jury's guilty verdict, [Rodriguez's] testimony is minimal, and it is clear that the prejudice prong of the [ineffectiveness] test is not established." PCO at 14.

We agree. In terms of how counsel's failure to impeach Rodriguez prejudiced him, Appellant simply states:

> Where M.R. herself repeatedly recanted her accusations to a large number of different people, admitted that she lied, tried to enlist [T.L.] in her scheme to frame [A]ppellant, and the complainants' versions had so many internal inconsistencies, and where Mr. Rodriguez was such a significant witness, it clearly prejudiced [A]ppellant's right to a fair trial when counsel failed to impeach this witness with his abundant criminal record.

*Id.* at 38-39. This argument is not sufficient to convince us that the jury's verdict hinged on the testimony of Rodriguez and that, had counsel impeached this witness, there is a reasonable likelihood the verdict would

have been different. Again, the jury heard the testimony of M.R., C.S., and C.R. detailing years of abuse by Appellant. M.R. did not confide solely in Rodriguez about this abuse. The Commonwealth presented testimony by law enforcement, a school counselor, and a DHS worker, who all testified that M.R. reported Appellant's abuse to them, as well. Consequently, we ascertain no error in the PCRA court's conclusion that Appellant failed to prove he was prejudiced by counsel's failure to impeach Rodriguez with his allegedly non-final criminal dispositions.

## **Testimony of Steven Galambos**

In his final issue, Appellant raises three sub-claims involving the court's preclusion of certain testimony by defense witness Steven Galambos, an agent for the Immigration and Customs Enforcement (ICE) Office of the United States Department of Homeland Security. First, Appellant claims that his trial counsel provided an inadequate offer of proof regarding the agent's proposed testimony. Appellant explains his argument as follows:

> The Commonwealth alleged that [A]ppellant had unlawful sexual contact with M.R. alone twice a week for six years, which amounts to something like 650 sexual encounters. M.R. herself testified that he had sex with her "almost every day" for six years. The Commonwealth was unable to establish dates when any of this conduct took place.
>
> To undercut the credibility of this testimony, [A]ppellant called [Agent] Galambos … to testify for two purposes: (1) that [A]ppellant was an accountant who served as an informant for ICE and that Agent Galambos had such frequent, long-lasting and unannounced sudden contact with [A]ppellant in that capacity that it was unlikely he had the free time or flexibility of schedule to do what M.R. alleged; and (2) that [A]ppellant enjoyed a good reputation for law-abidingness and peacefulness.

- 26 -

A careful reading of the trial transcript reveals that the trial court did not understand the first purpose for which this evidence was offered, as the court repeatedly made statements and rulings that reflected her mistaken belief that Agent Galambos was being offered solely as a character witness. For that reason[,] trial counsel was ineffective for failing to clearly support his proffer with the proper arguments [as to] why this evidence was critical to the defense and entirely admissible. This evidence, while circumstantial and somewhat imprecise itself, nonetheless undercut the Commonwealth's case by showing how unlikely M.R.'s version of events was.

Appellant's Brief at 41.

Appellant's claim of ineffectiveness lacks merit for several reasons.

First, at trial, counsel made the following offer of proof regarding Agent Galambos' testimony:

[Defense Counsel]: The offer of proof would be that [Agent Galambos and Appellant] had this specific working relationship and as a result of this working relationship, there never was any time for [Appellant] to be available to do the types of things that have been alleged in this courtroom.

…

For the record, Your Honor, [Appellant] worked with Agent Galambos since early 2004, in a confidential informant capacity.

Agent Galambos would have testified that [Appellant] was at [Agent] Galambos' beck and call, and that generally, there was no way for [Appellant] to know in advance when it was that he and [Agent] Galambos were going to have to go out and do things relative to their work or his work as a confidential informant.

Agent Galambos would have also testified that at no time did [Appellant] ever go out and do things on his own. If whenever he was out working in this confidential informant capacity, it was always in the company of Agent Galambos.

N.T. Trial, 7/6/09, at 37-38.

Appellant does not explain how this offer of proof could have been any clearer regarding the defense's purpose for calling Agent Galambos. Moreover, while Appellant claims that counsel should have "support[ed] his proffer with the proper arguments [as to] why this evidence was critical to the defense and entirely admissible[,]" he fails to elaborate on what those arguments should have been. Appellant's Brief at 41. Additionally, the record does not support Appellant's claim that the trial court misunderstood his dual purpose for calling the agent. After hearing the above-quoted offer of proof from defense counsel, the trial court stated that it would not permit such testimony by Agent Galambos. *Id.* at 38. It was only after this ruling that the trial court began referring to the agent as a character witness, which was precisely what the agent was at that point (given that his quasi-alibi testimony was precluded). *Id.* at 39. Accordingly, Appellant has failed to prove that counsel acted ineffectively in his offer of proof regarding Agent Galambos' testimony.[8]

Second, Appellant contends that his appellate counsel acted ineffectively for not arguing on direct appeal "the separate and distinct claim that the trial court erred in prohibiting Agent Galambos from establishing

---

[8] Appellant also argues that trial counsel acted ineffectively by failing to file a post-verdict motion to challenge the court's misunderstanding of his reason for offering the testimony of Agent Galambos. Appellant's Brief at 41. This argument fails for the same reasons as stated, *supra*.

how he knew [A]ppellant in order to support the character evidence." Appellant's Brief at 41. On direct appeal, counsel did challenge the court's preclusion of Agent Galambos' quasi-alibi testimony, but he did not contend that the court's preclusion order also improperly limited the scope of the *character* testimony proffered by the agent. Appellant claims that appellate counsel should have argued that the trial court erred by not allowing the agent to offer character testimony that he "worked with [Appellant] and other law enforcement officers day in and day out for years and would not have relied on [Appellant] as an informant unless he had a solid reputation in the law enforcement community[.]" Appellant's Brief at 41-42.

Appellant cites no legal authority to support his claim that the trial court erred in excluding this testimony, and we conclude that the court did not abuse its discretion in this regard. Our Court has explained

> **Evidence of good character offered by a defendant in a criminal prosecution must be limited to his *general reputation for the particular trait or traits of character* involved in the commission of the crime charged.** The cross-examination of such witnesses by the Commonwealth must be limited to the same traits. Such evidence must relate to a period at or about the time the offense was committed, and **must be established by testimony of witnesses as to the *community opinion* of the individual in question, *not through specific acts* or mere rumor.**

*Commonwealth v. Johnson*, 27 A.3d 244, 247-248 (Pa. Super. 2011) (quoting *Commonwealth v. Luther,* 463 A.2d 1073, 1077–1078 (Pa. Super. 1983) (citations omitted) (emphasis added)).

Here, Appellant does not explain how Agent Galambos' testimony that Appellant had a "solid reputation" in the law enforcement community, based on Appellant's "day in and day out" work with the agent, would have been admissible evidence of Appellant's general reputation in the community for a particular trait or traits of character involved in the commission of the crimes charged. Moreover, at trial, the agent was permitted to testify that he was a "Senior Special Agent with the Department of Homeland Security Immigration and Customs Enforcement" and that he had worked with Appellant "[s]ince January of 2004." N.T. Trial, 7/6/09, at 40-42. Agent Galambos also testified that he, and other people who knew Appellant "[a]s a result of working with [Appellant]," considered Appellant as "a law abiding" and "hard working" citizen. *Id.* Because the trial court permitted such testimony from Agent Galambos, and Appellant offers no legal authority supporting his claim that the court should have also allowed the proposed testimony discussed *supra*, we conclude that appellate counsel was not ineffective for failing to challenge on direct appeal the scope of character evidence permitted by the trial court.

Finally, Appellant argues that this Court should reexamine our holding on direct appeal, where we declined to disturb the trial court's decision to preclude Agent Galambos' quasi-alibi testimony. *See* Appellant's Brief at 42; *see also Ayala*, No. 986 EDA 2010, at 16-17. Essentially, Appellant complains that the direct appeal panel of this Court summarily affirmed the trial court's preclusion of Agent Galambos' testimony simply because it was

not "a true alibi defense[,]" without addressing "any of [A]ppellant's arguments." Appellant's Brief at 42. Appellant then contends that this Court should "exercise its inherent authority to correct manifest errors in the interests of justice by revisiting the claim that the trial court's preclusion order violated [A]ppellant's federal and state due process right to present a defense, as [A]ppellant briefed the claim on direct appeal." *Id.* at 43.

We decline Appellant's invitation to reassess this previously litigated issue. Namely, Appellant's argument that this Court should reevaluate our direct appeal decision is not cognizable under the PCRA. Moreover, our Supreme Court "has long recognized that under the coordinate jurisdiction rule, judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions." ***Riccio v. American Republic Ins. Co.***, 705 A.2d 422, 425 (Pa. 1997). Accordingly, we will not revisit the prior decision by a panel of this Court.

## Conclusion

For the reasons stated *infra*, we vacate the PCRA court's order denying Appellant's petition and remand for the court (1) to reconsider Appellant's first claim of trial counsel's ineffectiveness (involving counsel's failure to file a pretrial motion to sever Appellant's and Alfaro's cases), and (2) to conduct a hearing to address and correct the ostensible transcription errors in the jury instructions, after which the court shall reassess Appellant's claims that trial counsel acted ineffectively by not objecting to certain portions of those

instructions. In regard to Appellant's remaining claims, we ascertain no error in the PCRA court's dismissing them without a hearing.

Order vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judge Donohue joins this memorandum.

Judge Strassburger files a concurring memorandum in which President Judge Emeritus and Judge Donohue concur in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/20/2015